Filed 7/14/15  P. v. Vargas CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS VARGAS et al.,<br><br>    Defendant and Appellant. | B252948<br><br>(Los Angeles County<br>Super. Ct. No. BA401305) |

APPEAL from a judgment of the Superior Court of Los Angeles County, William N. Sterling, Judge.  Affirmed.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant, Carlos Vargas.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant, Adrian Barajas.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant, Joseph A. Pacheco.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant, Douglas Cornejo.

Kamala D. Harris, Attorney General, Gerard A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Appellants Carlos Vargas, Adrian Barajas, Joseph A. Pacheco, and Douglas Cornejo appeal from judgments and sentences following their convictions for kidnapping and attempted murder. They contend the trial court erred in admitting the preliminary hearing testimony of the victim, on the grounds (1) that the prosecution violated its obligations under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by failing to disclose impeachment evidence until after the preliminary hearing, and (2) that the admission of the preliminary hearing testimony violated their rights to confront and cross-examine the witness. They also contend the trial court erred in denying a defense request for a delayed discovery instruction. Cornejo separately contends that the trial court abused its discretion in excluding two exculpatory statements on the basis of hearsay. Finally, Cornejo and Pacheco contend there was insufficient evidence to support certain convictions and sentencing enhancements. Finding no reversible error, we affirm.

## PROCEDURAL HISTORY

Appellants were each charged in an amended information with attempted willful, deliberate, and premeditated murder of Valentin Anaya (Pen. Code,

2

§§ 664/187, subd. (a); count 1),[1] and kidnapping Anaya (§ 207, subd. (a); count 3). As part of a separate incident, Cornejo was charged with having a concealed firearm on his person (§ 25400, subd. (a)(2); count 7).  It was alleged the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  It was further alleged that Vargas personally and intentionally discharged a firearm which caused great bodily injury (§ 12022.53, subds. (b), (c), & (d)); that a principal personally and intentionally discharged a firearm (§ 12022.53, subds. (b), (c), (d) & (e)(1)); and that Cornejo personally used a firearm (§ 12022.53, subd. (b)).

Pacheco and Vargas were also charged with possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 5 & 9).  Vargas was alleged to have suffered one prior conviction within the meaning of the "Three Strikes Law" (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and three prior convictions for which he served a term in state prison (§ 667.5, subd. (b)).  Finally, Pacheco was alleged to have suffered two prior convictions for which he served a prison term (§ 667.5, subd. (b)).

A jury found appellants guilty as charged, and found true the firearm and gang allegations.  Vargas admitted the prior strike allegation and serving two prior prison terms.  Pacheco admitted one prior prison term, and the court struck the other prior.

The trial court sentenced Vargas to a total term of 68 years to life in state prison; Barajas to a total term of 32 years to life; Cornejo to a total term of 39 years to life; and Pacheco to a total term of 36 years to life.

Appellants each filed a notice of appeal.

---

[1]     All further statutory citations are to the Penal Code, unless otherwise stated.

3

## FACTUAL BACKGROUND

A.    *The Prosecution Case*

According to the prosecution, appellants were members of the Rockwood criminal street gang.  After obtaining information leading them to believe that a fellow gang member, Anaya, was an informant for law enforcement, appellants kidnapped Anaya, took him to an alley, and shot him in the head.  Anaya survived the shooting, and subsequently identified appellants as his assailants.

1.    *Anaya's Preliminary Hearing Testimony*

Trial proceedings started August 30, 2013.  After Anaya invoked his Fifth Amendment rights and declined to testify at trial, the trial court declared him unavailable.  His October 16, 2012 preliminary hearing testimony was then read into the record.  The testimony was as follows:

In 2012, Anaya had been a member of the Rockwood gang for several years.  Appellants were fellow gang members.[2]  On July 28, at about 8:00 p.m., Anaya went to Vargas's apartment to collect the money Vargas owed him for drugs.  Appellants were the only occupants.  Anaya had two or three guns on him.  In exchange for $100, he gave appellants one of the guns -- a .357-caliber revolver.

When Anaya went to the bathroom, he left his cell phone in the apartment to charge.  Vargas took Anaya's cell phone and looked through the contacts.  Among the contacts was a sheriff deputy's number.  Anaya had stored the deputy's phone number on his phone after the deputy had approached him in May 2012 to ask him some questions.  At the preliminary hearing, Anaya admitted calling the deputy, but denied agreeing to work for him.

---

[2]    Anaya did not know appellants' real names, but knew their gang monikers: Vargas was "Tico," Barajas was "Chubbs," Cornejo was "Little Man," and Pacheco was "Stomper."

When Anaya came out of the bathroom, Vargas told him to go back inside. Cornejo, who was armed with a gun, told Anaya to stay in the bathroom and locked him inside. After about an hour, Vargas entered and asked Anaya, "Who are you working for?" Anaya replied, "What? What are you talking about?" Vargas repeated: "Who are you working for?" He then said, "You fucked up," and stepped outside. Barajas entered, told Anaya that he had "fucked up," and struck him in the face. Cornejo and Pacheco then entered the bathroom separately and struck Anaya in the face.

Barajas came back and told Anaya to get in the tub. Vargas and Pacheco then entered. Vargas had the .357 gun and Pacheco was armed with a .45-caliber handgun. Vargas then injected Anaya with methamphetamine. Vargas tied Anaya's hands behind his back with shoelaces, placed a hooded sweatshirt over his head, and led him out of the apartment to a green truck parked outside. Vargas, Cornejo, and Anaya got into the truck. Anaya could not see the driver. Pacheco, who was wearing a Global Positioning System (GPS) tracking device as a condition of parole, stayed behind in the apartment.[3] Anaya did not know Barajas's location. When shown still pictures from a video surveillance of the building taken at the time, Anaya identified the men in the picture as Vargas, Pacheco, and Barajas.

After about an hour, the truck stopped near an alley. Cornejo exited, and Vargas pulled Anaya out of the vehicle. Vargas ordered Anaya to go to a corner of the alley, but Anaya started to run away. Vargas took out the .357 handgun and shot Anaya in the head. The bullet entered the left side of Anaya's head and exited the top. Cornejo took out his gun and attempted to shoot Anaya, but the gun

---

[3]  The location data from Pacheco's tracking device showed he entered the apartment at 7:05 p.m., and remained there until 6:39 a.m. the next morning.

jammed. Anaya fell to the ground and pretended to be dead. Vargas said, "He's gone." Vargas and Cornejo then re-entered the truck. Anaya, afraid the truck would run him over, got up to run away. The truck driver tried to run him down. The side of the truck's bumper struck Anaya, sending him flying into a trash can. Anaya got up and started running. He heard several gunshots and dropped to the ground. The truck drove away. Anaya went to a store and called 911 at 4:52 a.m. He was taken to a hospital, treated, and released.

Anaya was questioned by police officers, but he provided them with "different stories so I could just get them off my back." After Anaya was released from the hospital, he agreed to speak with Los Angeles Police Detective Carlos Carias. Detective Carias interviewed Anaya at the police station, and showed him photographs in a Rockwood gang photobook. Anaya identified Vargas's photograph and wrote: "This individual was the one who shot me in the head, number 3. Tico [Vargas] is the one who tied me down and escorted me to the vehicle. I was told by him to get on the floor. Once arriving . . . at the alley, I was dragged out and shot by Tico." He also identified photographs of Pacheco and Cornejo, writing: "Stomper [Pacheco] number 210, Little Man [Cornejo] number 211 were involved in the crime of laying hands on me before I got shot in the head. I received a few blows from these individuals and had a gun pointing at my head. Little Man got -- Little Man's gun got jammed in the alley. So that's why I only got one shot in the head by Tico."

On August 4, 2012, Anaya identified Barajas's photograph and wrote: "This individual in photo six I know him as Chubbs from Rockwood for several years. Chubbs took me with Tico. And I got beat up. Later that night I was shot in the alley. Chubbs was the first one who said I fucked [up]."

Anaya also identified appellants as his assailants at the preliminary hearing.

## 2.    *Other Trial Testimony*

At the trial, Los Angeles Police Officer John Boverie testified that at approximately 4:55 a.m. on July 28, he responded to a call of a shooting. Arriving at the scene, he observed Anaya sitting on a chair, holding a towel to his head. Anaya had a gunshot wound to the left portion of his head and a shoe string tied to his right wrist. He did not respond to Officer Boverie's inquiries about who had shot him. The paramedics then arrived and took Anaya to the hospital.

Los Angeles Police Officer Ramon Gracia testified that he also responded to Anaya's 911 call. When he arrived, he observed a male Hispanic bleeding profusely from his head. When questioned, Anaya was uncooperative and provided inconsistent explanations for his injuries. When Anaya was taken to the hospital, Officer Gracia followed and interviewed him at the hospital. After providing several versions of the events, Anaya told Officer Gracia that he would tell him the truth. Anaya stated that he had gone with some of his "homies" to purchase beer. After they purchased the beer, they began driving to a different location. While in the car, one of his homies punched him and another overpowered him and tied his hands behind his back. The car eventually stopped at an alley, and one of his homies grabbed him and started to drag him into the alley. Another homie then drew a .357 and shot him. Anaya fell to the ground and pretended to be dead. After the men left him, he got up and began to run. As he was running, the car struck him. Anaya told Officer Gracia that he was an active gang member, and that he thought he was shot because his homies thought he was a "rat."

Detective Carias testified that he was assigned to investigate the shooting. He was informed that the victim had been checked into a hospital, and that the victim had identified himself as Rogelio Garcia. After determining that the

7

victim's real name was Valentin Anaya, the detective interviewed Anaya at the police station. In addition to identifying appellants as his assailants, Anaya also provided information about the location of the shooting.

Detective Carias also testified that at one point, Anaya said he did not know the name of the driver of the green truck. At another point, Anaya said he knew the name of the driver, but would say only that the driver was a Rockwood gang member. Anaya also told the detective that as he was being taken from Vargas's apartment to the truck, he saw a Rockwood gang member by the name of "Cricket."

After Anaya told Detective Carias that he was afraid for his safety and for his family's safety, the detective moved Anaya and his family to a "safe house." Detective Carias paid for the motel directly with emergency funds, and he gave Anaya additional money for food. In order to receive the money, Anaya signed a form stating that he would not commit any crimes. Detective Carias testified that he gave Anaya $60 in cash on July 29, and $40 on July 30. On August 16th and September 16th, the detective gave Anaya $350 for food. On October 16th, he gave Anaya $350 for food and $300 for incidentals. On December 4th, he gave Anaya $1100 for food and $225 for incidentals. Finally, on January 4, 2013, he gave Anaya $1100 for food. The food allowance was for both Anaya and his family. In total, including the housing assistance, $7,750 was provided to Anaya and his family.

After Detective Carias interviewed Anaya, he visited Vargas's apartment building and looked at surveillance video taken at the time of the incident. The detective used his cell phone to capture the surveillance video and to take still photographs of the video. On August 8, Detective Carias showed the surveillance

8

video to Los Angeles Police Detective Antonio Hernandez.  Detective Hernandez recognized Vargas in the video from prior contacts with him.

The next day, while driving around Rockwood gang territory looking for the shooting suspects, Detective Hernandez and his partner, Officer Philip Zalba, saw Vargas.  Vargas saw the officers and ran away, eventually entering a swap meet or flea market.  When Vargas exited the business, Detective Hernandez was waiting outside and apprehended him.  The detective searched Vargas, and found a small bag of ammunition on his person, containing fifteen .357-caliber bullets.  Inside a hole in the wall of the flea market, police officers recovered a loaded .357 revolver.

Immediately after Vargas was arrested, Detective Hernandez learned that Barajas was next door, inside a cell phone store.  The officers arrested Barajas there.

Pacheco and Cornejo were arrested the following weeks.  On August 14th, Los Angeles Police Officer Arthur Meza observed Pacheco and noticed he was wearing a GPS tracking device, indicating he was on parole.  Officer Meza and his partner approached Pacheco to initiate a parole search.  As the officers approached, Pacheco placed one of his arms into his waistband, and grabbed a woman, placing her between himself and the officers.  Pacheco said, "I don't want to do this."  The officers ordered him to let the woman go, but Pacheco refused.  The officers sprayed Pacheco with pepper spray, but Pacheco attempted to hide his face in the woman's hair.  Officer Meza's partner then tackled Pacheco and took him to the ground.  As he fell, Pacheco released the woman.  He resisted for about 15 seconds.  After he was handcuffed, Pacheco indicated he was in possession of a firearm.  The officers recovered a loaded .45-caliber semiautomatic handgun from Pacheco's front waistband.

9

On August 22, Detective Hernandez saw Cornejo walking in Rockwood gang territory. When Cornejo noticed the officer, he ran away in the opposite direction. As he was being chased, Cornejo threw a revolver over his head. Cornejo was apprehended after tripping on the stairs. The handgun was recovered; it was a Smith and Wesson chrome .22-caliber revolver, loaded with six bullets.

Los Angeles Police Officer Michael Chang testified he interviewed Cornejo after his arrest. After waiving his *Miranda* rights,[4] Cornejo told the officer that he had stolen the .22-caliber handgun from another Rockwood gang member, whom he did not like. He had taken it from "some bushes." Cornejo stated that he needed the handgun for protection because he had been "jumped out of Rockwood Street [gang] and . . . had been in a fight in juvenile hall with some juvenile."

In February 2013, Anaya was arrested for possession of an assault rifle. He told Officer Joseph Villagran that he had purchased the rifle for protection against the Sinaloa Cartel. He explained that he had lost a pound of methamphetamine belonging to the Sinaloa Cartel, and that a "hit" had been placed on him. Several days later, Officer Bobby Romo interviewed Anaya. During this interview, Anaya provided a different explanation for his possession of the rifle. Anaya said that in July 2012, his fellow gang members had tried to kill him because they believed he was a "rat." He stated: "I bought myself a gun for protection after I was shot in the head by former gang members."

Detective Hernandez testified as the prosecution gang expert. Detective Hernandez personally knew Vargas, Pacheco, and Cornejo to be members of the Rockwood gang; they had admitted to him that they were gang members. Vargas was known by the gang moniker, "Tico" or "Tiko." Pacheco was known by the gang monikers, "Stomper" and "Thumper." Cornejo was known by the gang

4    *Miranda v. Arizona* (1966) 384 U.S. 436.

monikers, "Clash" and "Baby Tiny." Although Detective Hernandez never had any personal contact with Barajas, Detective Hernandez opined that Barajas was a Rockwood gang member based on his gang tattoos and Anaya's statements.

Given a hypothetical fact pattern based on the facts of this case, Detective Hernandez opined that the kidnapping and attempted murder of a suspected gang informant was committed for the benefit of and in association with the Rockwood criminal street gang. The assailants were all gang members from the same gang, and the crimes would benefit the gang because they would discourage other gang members from working with law enforcement. Detective Hernandez also opined that when Cornejo was arrested on August 22, he possessed the .22-caliber handgun for the benefit of a criminal street gang, because having a gang member with a gun in gang territory would allow the gang to protect its territory from rival gangs. The detective also explained that a gang would have easily accessible and hidden places to store guns -- such as a bush -- for gang members to use. He also opined that only gang members would know these locations.

B. *The Defense Case*

Appellants did not testify. Dr. Mitchell Eisen, a psychologist, testified on behalf of Cornejo. Dr. Eisen testified about possible flaws in a witness's identification of suspects due to factors such as traumatic stress.

## DISCUSSION

Appellants contend they were denied a fair trial because (1) the prosecution committed various *Brady* violations; (2) they were denied their right to confront and cross-examine Anaya about witness relocation assistance and his fear of the Sinaloa drug cartel; and (3) the trial court erred in denying their request for an instruction on the delayed disclosure of *Brady* evidence.

11

Pacheco separately contends there was insufficient evidence to support the jury's finding that he aided and abetted in the kidnapping and attempted murder of Anaya. Cornejo separately contends there was insufficient evidence to support the jury's findings that he stole the .22 handgun from a Rockwood gang member and at the same time that he possessed the handgun to benefit the Rockwood gang. Cornejo also contends that the trial court abused its discretion by excluding two hearsay statements of Anaya that he saw another gang member -- with the moniker Cricket -- when he was being kidnapped.

A.    *Purported Brady Violations*

Suppression of favorable evidence that is material, either to guilt or punishment, violates due process. (*Brady*, *supra*, 373 U.S. at p. 87; accord, *Strickler v. Greene* (1999) 527 U.S. 263, 281-282.) Evidence is "favorable" to the defense "if it helps the defense or hurts the prosecution, [such] as by impeaching a prosecution witness." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "Evidence is material if there is a reasonable probability its disclosure would have altered the trial result." (*People v. Zambrano*, *supra*, at p. 1132.) No *Brady* violation occurs if the previously suppressed evidence is presented at trial. (*People v. Verdugo* (2010) 50 Cal.4th 263, 281.)

The prosecution's *Brady* obligation extends to the preliminary stage of criminal proceedings. (*People v. Gutierrez* (2013) 214 Cal.App.4th 343, 348.) However, for preliminary hearings, "the standard of materiality is whether there is a reasonable probability that disclosure of the exculpatory or impeaching evidence would have altered the magistrate's probable cause determination with respect to any charge or allegation." (*Bridgeforth v. Superior Court* (2013) 214 Cal.App.4th

12

1074, 1087.) "In addition, . . . the duty of prepreliminary hearing disclosure extends only to matters within the possession or control of the prosecution team before the conclusion of the preliminary hearing." (*Ibid*.) "We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

### 1. *Witness Relocation Assistance*

Appellants contend the prosecution violated *Brady* when it failed to disclose that Anaya had received witness relocation assistance until after the preliminary hearing.

#### a. *Relevant Factual Background*

After the October 16, 2012 preliminary hearing but before trial, defense counsel were informed that Anaya had received relocation assistance. The prosecution did not provide the actual documentation of the assistance until after Anaya's prior testimony had been read to the jury. After reviewing the documentation, the trial court concluded that "the only thing that is relevant and the only thing that's potentially exculpatory or otherwise relevant is an itemization of how much was paid." The court ordered the prosecutor to turn over to the defense a copy of the documents under seal and an itemization of the amounts and dates of the relocation assistance.[5]

---

[5] Appellants have requested that this court independently review the sealed exhibits for any exculpatory or impeachment evidence. Although the sealed exhibits could not be located, the record indicates that defense counsel received a copy of "exactly what the [trial] court reviewed." The prosecution and defense counsel then redacted the exhibits to provide them to the jury.

When the documents were provided to defense counsel, Vargas's counsel asked whether Anaya had signed any documents, either to receive the money or to work as an informant. The prosecutor responded that Anaya had to sign an agreement to receive the money, but that he was unaware of any agreement showing Anaya was an informant for any law enforcement agency. Defense counsel asked the court to review the signed agreement, and suggested that the agreement may have required Anaya to commit no further crimes. The court agreed, but stated its belief that an agreement to commit no further crimes would not be exculpatory.

As detailed above, defense counsel elicited trial testimony from Detective Carias about the relocation assistance provided to Anaya. Specifically, Detective Carias testified that Anaya signed a document agreeing to commit no further crimes in exchange for the assistance, and that a total amount of $7,750 was provided to Anaya and his family. In addition, during closing, Vargas's counsel argued that although Anaya may have been a trustworthy witness because he was afraid of his fellow gang members, "[i]t's just as likely he was a con man and knew the system, and tried to rip the system off of $8,000."

        b.    *Analysis*

In order to demonstrate that the prosecution violated its *Brady* obligations, appellants must show a suppression of evidence that was both favorable and material. Here, it is unclear whether evidence of witness relocation assistance is favorable. (Compare *United States v. Davis* (5th Cir. 2010) 609 F.3d 663, 696 [information that witness was offered witness protection not favorable to defendant because jury may have assumed that witness needed protection from defendant] with *United States v. Talley* (6th Cir. 1999) 164 F.3d 989, 1003 [noting that relocation benefit for key government's witness should be disclosed as

14

impeachment evidence].) Even assuming that evidence that Anaya received relocation assistance constituted impeachment evidence, appellants have failed to show that the evidence was material, or that it was suppressed at trial.

As discussed above, for preliminary hearings, evidence is material if "there is a reasonable probability that disclosure of the exculpatory or impeaching evidence would have altered the magistrate's probable cause determination with respect to any charge or allegation." (*Bridgeforth v. Superior Court*, *supra*, 214 Cal.App.4th at p. 1087.) Here, it is undisputed that Anaya was shot in the head. He identified appellants as his assailants to Detective Carias, and the record shows that his identification was made before any offer of assistance. In addition, Vargas, Pacheco, and Barajas were identified from still photographs taken from video surveillance at the time of the incident. Finally, the relocation assistance was not offered in exchange for testimony and was not dependent on Anaya's testifying at trial. (Cf. *People v. Westmoreland* (1976) 58 Cal.App.3d 32, 44-46 [leniency offered in exchange for testimony].) In short, appellants have not shown there was a reasonable probability that the evidence of witness relocation assistance would have altered the magistrate's probable cause determination. Thus, no *Brady* violation occurred at the preliminary hearing stage.

Similarly, appellants have not shown a *Brady* violation at the trial stage. There was no suppression of evidence because the jury heard about the relocation assistance provided to Anaya. (See *People v. Verdugo*, *supra*, 50 Cal.4th at p. 281 ["'[E]vidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery.' [Citation.]"].) After considering the evidence, the jury found Anaya's identification of appellants credible and convicted them. On this record, appellants cannot show a *Brady* violation.

15

2.    *Anaya's Statements to Detective Carias About Gang Member "Cricket"*

At trial, Detective Carias testified that Anaya told him he knew the driver of the green truck, but would not disclose any information about the driver other than the fact that he was a Rockwood gang member.  Anaya also told the detective that when he was being taken to the truck, he saw a Rockwood gang member named Cricket.  Barajas contends the failure to disclose the transcript of this interview prior to the preliminary hearing was a violation of the prosecution's obligations under *Brady*.  We disagree.

First, as appellant Barajas concedes, trial counsel failed to object to the late disclosure of the transcript on *Brady* grounds.  Thus, this argument has been forfeited.  (*People v. McPeters* (1992) 2 Cal.4th 1148, 1174.)  Even were we to consider this issue, we would find no *Brady* violation.  As appellant's counsel admitted in the trial court, prior to the preliminary hearing, he had a copy of the recording of the interview, although "a lot of it was in Spanish, translations pending."  Moreover, appellant's counsel had a copy of the transcript at the preliminary hearing.  Although counsel asserted he did not have the opportunity or time to read the entire interview transcript, he never requested a continuance.  In addition, at trial, Vargas's counsel elicited testimony about Cricket from Detective Carias, and in closing argument suggested the police should have investigated whether Cricket had been involved in the crimes.  On this record, appellant Barajas has not shown that evidence of Anaya's statements about Cricket was suppressed by the prosecution, either at the preliminary hearing stage or at trial.  Thus, he has failed to demonstrate a *Brady* violation.  (See *People v. Verdugo*, *supra*, 50 Cal.4th at p. 281.)

B.    *Whether Admission of the Preliminary Hearing Testimony Violated the Confrontation Clause.*

"A criminal defendant has a constitutionally guaranteed right to confront and cross-examine the witnesses against him or her.  [Citations.]  The right of confrontation is not absolute, however, and may 'in appropriate cases' bow to other legitimate interests in the criminal trial process.  [Citations.]  An exception to the confrontation requirement exists where the witness is unavailable, has given testimony at a previous judicial proceeding against the same defendant, and was subject to cross-examination by that defendant.  [Citations.]  Further, the federal Constitution guarantees an opportunity for effective cross-examination, not a cross-examination that is as effective as a defendant might prefer.  [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1172.)  This exception is codified in the California Evidence Code at section 1291.  Section 1291 provides, in relevant part, that "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and . . . [¶] . . . [¶] [t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."  When the requirements of Evidence Code section 1291 are met, "the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right."  (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)

Appellants contend the admission of Anaya's preliminary hearing testimony violated their constitutional right to confront him, because they did not have an adequate opportunity to cross-examine him about (a) the witness relocation

assistance, (b) his statements relating to Cricket, and (c) his fear of the Sinaloa drug cartel. We conclude there was no reversible error.

Here, the requirements of Evidence Code section 1291 were met. Anaya was unavailable to testify at trial because he invoked his Fifth Amendment right to remain silent. Anaya was cross-examined by appellants' counsel at the preliminary hearing, including on his identification of appellants as his assailants. Appellants' interest and motive in cross-examining Anaya at the preliminary hearing were closely similar, if not identical to, their objectives at trial -- namely, to attempt to discredit the prosecution's theory that they kidnapped and attempted to kill Anaya. (See *People v. Carter*, *supra,* 36 Cal.4th at p. 1172 [defendant's interest and motive in cross-examining adverse witness -- to discredit prosecution's theory of the case -- were sufficiently similar at the preliminary hearing and at trial to satisfy requirements of Evidence Code section 1291].)

Appellants' inability to cross-examine Anaya about witness relocation assistance at the preliminary hearing did not render their cross-examination constitutionally inadequate. Anaya identified appellants as his assailants prior to any offer of relocation assistance. Additionally, at trial, appellants were able to cross-examine Detective Carias about his payments to Anaya as part of the witness relocation program. Thus, the jury was able to consider the relocation assistance in determining Anaya's credibility. On this record, they failed to demonstrate any confrontation clause violation.

As to Anaya's statements relating to Cricket, appellant Barajas has failed to demonstrate that he lacked an adequate opportunity to cross-examine Anaya about those statements. As detailed above, Barajas's counsel had a copy of the recording of the interview before the preliminary hearing and a copy of the interview transcript at the preliminary hearing. Thus, he had an opportunity to cross-

18

examine Anaya about the statements he had made relating to Cricket in that interview.  As Barajas's counsel had the opportunity for cross-examination, the admission of the preliminary testimony under Evidence Code section 1291 did not violate the confrontation clause.  (*People v. Carter*, *supra*, 36 Cal.4th at pp. 1172 & 1174 [confrontation clause guarantees an opportunity for cross-examination, not a particular form of cross-examination].)  Moreover, the jury heard about the presence of Cricket outside the apartment on the night Anaya was shot, and was urged in closing argument to consider whether Cricket may have been involved.  On this record, Barajas has failed to demonstrate a confrontation clause violation.

As to Anaya's fear of the Sinaloa drug cartel, his statements concerning the drug cartel were made on February 15, 2013, four months after the preliminary hearing.  Those statements were not inconsistent with any of Anaya's statements at the preliminary hearing.  Moreover, the statements were presented to the jury through the trial testimony of Officer Villagran.  In short, the admission of Anaya's preliminary hearing testimony did not violate appellants' confrontation rights.[6]

---

[6]    Appellants also contend they received ineffective assistance of counsel when trial counsel failed to move to strike Anaya's preliminary testimony on the basis that the prosecution had violated *Brady* and the confrontation clause.  In order to prevail on a claim of ineffective assistance of counsel, appellant must show (1) that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) that there is a reasonable probability that but for counsel's unprofessional errors, the result would have been more favorable to the defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Gray* (2005) 37 Cal.4th 168, 206-207; *People v. Kelly* (1992) 1 Cal.4th 495, 519-520.)  We conclude that appellants have failed to show either prong.  First, Barajas's counsel objected to the admission of Anaya's preliminary testimony on the ground his client's right to confront and cross-examine Anaya during the hearing was "hampered," and Vargas's counsel made a *Brady* objection.  In light of these evidentiary objections, other trial counsel need not raise the same objections on behalf of their clients.  When the trial court overruled the objections,

19

C.     *Jury Instruction on Delayed Disclosure of Evidence*

Appellants next contend the trial court abused its discretion in denying a defense request to instruct the jury with CALCRIM No. 306, as a sanction for the prosecution's failure to disclose the witness relocation assistance.  CALCRIM No. 306 generally informs the jury that a party has failed to disclose relevant evidence, that the failure may deny the other side an opportunity to receive a fair trial, and that the late disclosure may be considered when evaluating the evidence.  The trial court denied the request on the ground that evidence of the relocation assistance had been presented to the jury.  We discern no abuse of discretion.

As discussed, the prosecution has an obligation under *Brady* to disclose favorable evidence.  In addition, "[s]ection 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies."'  [Citation.]  Evidence subject to disclosure includes  . . . '[a]ny exculpatory evidence' [citation].  'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial.  (§ 1054.7.)'  [Citation.]  [¶]  Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court . . . may . . . 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.'  [Citation.]  A violation of section 1054.1 is subject to the

trial counsel were not unprofessional for failing to move specifically to strike the testimony on the same grounds.  Moreover, as we have determined that there was no *Brady* violation and that the admission of the preliminary hearing testimony did not violate appellants' confrontation clause rights, appellants cannot show prejudice.

harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. [Citation.]" (*People v. Verdugo*, *supra*, 50 Cal.4th at pp. 279-280.)

Here, appellants were not prejudiced because the information was presented to the jury through the cross-examination of Detective Carias. (See *People v. Verdugo*, *supra*, 50 Cal.4th at p. 281 [no *Brady* violation where previously undisclosed evidence was presented at trial; no prejudice from violation of section 1054.1 where defense counsel had time to prepare for cross-examination on previously undisclosed evidence].) As a result, no instruction regarding delayed disclosure was required. Moreover, for the reasons stated above, any error in failing to instruct the jury regarding delayed discovery was harmless under any standard of reversible error. (*Chapman v. California* (1967) 386 U.S. 18, 22; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)


D.      *Whether the Trial Court Abused its Discretion in Excluding Certain Statements Anaya had Made to Detective Carias Regarding Cornejo.*

At the preliminary hearing, Anaya testified that when he was dragged into the alley, Vargas shot him in the head. Anaya also testified that "Little Man" (Cornejo) drew a handgun and tried to shoot him, but the gun jammed. Vargas and Cornejo then reentered the truck. As Anaya began running away, two shots were fired from the vehicle.

At trial, the court precluded Cornejo's counsel from introducing two statements Anaya made to Detective Carias, stating that "Little Man" was screaming after the shots were fired from the vehicle and speculating that Cornejo might have shot himself in the foot.[7] Defense counsel had sought to introduce the

---

[7]      Anaya told Detective Carias: "And then, boom. Then . . . the Expedition went in reverse. Then they left again. And . . . at that time, I heard Little Man, that

21

statements to show that Cornejo was not "Little Man," because when arrested a few weeks later, Cornejo showed no sign of injury. The trial court determined that the two statements were not inconsistent with Anaya's preliminary hearing testimony: "There was some kind of scream after they were in the car. There's no testimony about it. And there's no way of knowing whether he was screaming because he was frustrated at his gun or he was screaming because Mr. Anaya had gotten back up or they were driving away or -- you know, it's total speculation that he was screaming because he shot himself." The court excluded the statements as hearsay, and also under Evidence Code section 352, as being more prejudicial than probative. On appeal, Cornejo contends the trial court abused its discretion in excluding the statements. We disagree.

Evidence Code section 1235 provides that "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing . . . ." Here, there was no preliminary hearing testimony whatsoever about Cornejo screaming. Thus, there is no inconsistency between Anaya's preliminary hearing testimony and the two hearsay statements defense counsel sought to introduce.

Cornejo contends in the alternative that the statements were admissible under Evidence Code section 356, which provides: "Where part of an act,

---

he got off. Because the fool said, get out, get out. He told him, get out, fool. So fucking -- I could hear Tico's voice. You know, I recognized him. And then, when Little Man shot, that's -- oh I don't know if -- I don't know if he shot himself because the gun -- he was having problems with the gun. So he shot. He goes, oh." Detective Carias asked, "So you heard him?" Anaya replied: "I heard him. You know, I don't know why he was going to scream, you know." Anaya further stated, " So I think, like, in my head, after all the incident when I was just in the hospital thinking like -- this fool fucking shoot himself, or what?" Later the detective asked Anaya if he had heard Little Man screaming, and Anaya answered in the affirmative.

22

declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing *which is necessary to make it understood* may also be given in evidence." (Italics added.) He contends the two statements were part of the "same subject matter of the entire shooting incident." We discern no error in the trial court's exclusion of the statements. They did not resolve any ambiguity, clarify or otherwise explain Anaya's testimony, and the record reflects they were unnecessary to understand the testimony.

Moreover, even had the court erred, any error would be harmless. (*People v. Garcia* (1984) 160 Cal.App.3d 82, 93, fn. 12 [evidentiary errors are tested under harmless error standard of *People v. Watson, supra,* 46 Cal.2d at p. 836].) Anaya identified Cornejo as one of his assailants. The statements indicated that Cornejo had screamed after the shots were fired at Anaya from the truck. Anaya never stated that he observed Cornejo shoot himself in the foot, or heard anyone say that Cornejo had been shot. Although Anaya speculated that Cornejo may have screamed because he shot himself in the foot, it is just as likely that Cornejo screamed because the shots had missed Anaya. Thus, even had the statements been admitted, it is not reasonably probable that the jury would have reached a different result.

E.     *Sufficiency of the Evidence*

Cornejo and Pacheco challenge the sufficiency of the evidence to support certain of their convictions and sentencing enhancements. "In determining whether the evidence is sufficient to support a conviction or an enhancement, 'the relevant question is whether, after viewing the evidence in the light most favorable

to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] Under this standard, 'an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Rather, the reviewing court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.)

1.    *Cornejo's Conviction for Carrying a Concealed Firearm that was Stolen*

As detailed above, on August 22, 2012, Detective Hernandez arrested Cornejo after a short pursuit. During the pursuit, Cornejo had thrown a loaded .22 handgun away. When he was interviewed, Cornejo told Officer Chang that he had stolen the gun from a Rockwood gang member and that he needed it for protection because he had been "jumped out" of the Rockwood gang and had gotten into a fight with a juvenile.

As a result of this incident, Cornejo was charged with having a concealed firearm on his person, in violation of section 25400, subdivision (a)(2). It also was alleged that he committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The jury found Cornejo guilty as charged and found true the gang enhancement allegation. It also found true that the firearm was stolen, and that Cornejo knew or reasonably should have known that it was stolen. The latter finding is significant because it elevates the offense from a misdemeanor

24

to a felony. (See § 25400, subd. (c)(2).) The trial court sentenced Cornejo to three years on count 7, plus four years for the gang enhancement.

Appellant contends the evidence was insufficient to support the jury's findings that the firearm was stolen and that he committed the offense for the benefit of the Rockwood street gang. We disagree. As to the gang enhancement allegation, the gang expert's testimony was sufficient to prove the elements of that allegation. (See, e.g., *People v. Williams* (2009) 170 Cal.App.4th 587, 621; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332-1333.) As to whether the handgun was stolen, appellant himself told Officer Chang he had stolen the handgun.

Appellant contends it would be inconsistent for him to possess a concealed firearm to benefit the Rockwood gang when he had been "jumped out" of the gang and had stolen it from a Rockwood gang member. We disagree. First, the jury was not required to believe Cornejo's statement that he had been jumped out of the gang. Indeed, Detective Hernandez opined that only gang members would know the hidden locations where a gang would store firearms. Second, nothing precludes animosity between members of the same gang. Appellant could have stolen the handgun from another gang member for myriad reasons, none of which would negate the fact that the Rockwood gang benefitted from having a member armed in gang territory to defend it from rival gangs. Stated differently, the gang would benefit if Cornejo were willing to defend its interests despite any personal animosity toward a specific gang member. In short, a reasonable jury could have made both findings, and there was substantial record in the evidence to support them.

2. *Pacheco's Convictions as an Aider and Abettor in the Kidnapping and Attempted Murder of Anaya*

As detailed above, Anaya testified that Pacheco, armed with a .45-caliber handgun, was present in the apartment and participated in assaulting Anaya in the bathroom. Anaya also testified that Pacheco remained in the apartment when Anaya was taken to the green truck, driven to the alley, and shot. Pacheco's GPS tracking device showed that Pacheco remained in the apartment. In closing argument, the prosecutor stated it did not matter that Pacheco remained behind because he aided and abetted in the kidnapping and murder. The jury convicted Pacheco on all counts.[8]

Pacheco contends there was insufficient evidence to support the jury's finding that he aided and abetted in the kidnapping and attempted murder of Anaya. We disagree. "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus -- a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea -- knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus -- conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Here, the prosecution proved that the other defendants -- the direct perpetrators -- kidnapped and attempted to murder Anaya. As to Pacheco's mens rea and actus reus, the jury heard the following: Pacheco was present when Anaya gave Vargas the .357 handgun, when Vargas asked Anaya whether Anaya was an

_____

[8] The jury was instructed on direct aider and abettor liability. The prosecution declined to proceed on a natural and probable consequences or uncharged conspiracy theory.

26

informant, when Vargas told Anaya to remain in the bathroom, and when Cornejo threatened Anaya with a gun. Pacheco participated in beating up Anaya, and he was present and armed with a .45-caliber handgun when Vargas injected Anaya with methamphetamine. Pacheco was also present when Vargas placed a sweater over Anaya's head and took him out of the apartment. On this record, a reasonable jury could infer that Pacheco knew that his fellow gang members, who were armed with handguns, would take Anaya, who was suspected of being an informant, to another location and shoot him. (Cf. *People v. Moore* (1953) 120 Cal.App.2d 303, 306 ["'The presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he was guilty of aiding and abetting; and it has also been held that presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred'"].) Pacheco aided the offenses by participating in beating Anaya and provided an armed presence when Vargas was injecting him with methamphetamine, both acts that rendered Anaya more malleable and less likely to resist the kidnapping and shooting. Moreover, a reasonable jury could have inferred that the only reason Pacheco, who was armed, did not accompany the other appellants as they kidnapped and shot Anaya was because he had a GPS tracking device on his person. In short, there was substantial evidence in the record to support Pacheco's convictions.

F.    *Cumulative Error*

Finally, appellants contend that, even if harmless individually, the cumulative effect of these claimed trial errors mandates reversal of their convictions. Because we have found no error, their claim of cumulative error fails.

27

(See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

## DISPOSITION

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.